1 Jon B. Fougner (State Bar No. 314097)
jon@fougnerlaw.com
2 600 California Street, 11th Floor
San Francisco, California 94108
3 Telephone: (415) 577-5829
Facsimile: (206) 338-0783
4

5 [Additional counsel appear on signature page]

6 *Attorneys for Plaintiffs William Loftus, Sidney*
*Naiman, Louis Naiman and the Proposed*
7 *Classes*

8

9 UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
10 OAKLAND DIVISION

11

12 WILLIAM LOFTUS, SIDNEY NAIMAN        Case No. 3:19-cv-01608-YGR
and LOUIS NAIMAN, individually and on
13 behalf of all others similarly situated,          **FIRST AMENDED COMPLAINT FOR
INJUNCTION AND DAMAGES**
14
Plaintiffs,
15 v.                                               **Class Action**

16
SUNRUN INC. and MEDIA MIX 365,                **JURY TRIAL DEMAND**
17 LLC, and DOES 1-10,
Complaint Filed: March 27, 2019
18
Defendants.
19

20

21        Plaintiffs William Loftus, Sidney Naiman and Louis Naiman, by their undersigned

22 counsel, for this first amended class action complaint against Defendants Sunrun Inc. ("Sunrun")

23 and Media Mix 365, LLC ("Media Mix") and their present, former and future direct and indirect

24 parent companies, subsidiaries, affiliates, agents and related entities, allege as follows:

25                          **I.      INTRODUCTION**

26        1.  <u>Nature of Action</u>: This case arises from Defendants' unsolicited telemarketing in

27 violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"), and their non-

28

consensual recording of cellular communications in violation of the California Invasion of

Privacy Act ("CIPA"), Cal. Penal Code § 632.7.

2.   The telemarketing was conducted using automated telephone dialing systems

("ATDSs"), a tactic among those that inspired Congress to enact the TCPA and that most

infuriate consumers to this day.

3.   The telemarketing targeted, among other phone lines, cellular telephones and

numbers listed on the National Do Not Call Registry ("NDNCR").

4.   For every 7,000,000 robocalls, there's only one TCPA lawsuit in federal court.

*Compare* Herb Weisbaum, *It's Not Just You—Americans Received 30 Billion Robocalls Last*

*Year*, NBC News (Jan. 17, 2018), https://www.nbcnews.com/business/consumer/it-s-not-just-

you-americans-received-30-billion-robocalls-n838406 (30.5 billion robocalls); *with* WebRecon,

*WebRecon Stats for Dec 2017 & Year in Review* (last visited Oct. 29, 2018),

https://webrecon.com/webrecon-stats-for-dec-2017-year-in-review/ (4,392 TCPA complaints).

5.   Demonstrating the massive scope of its robocalling, Sunrun has lost this 1-in-

7,000,000 lottery repeatedly, being sued under the TCPA time and again. *E.g.*, Notice Removal,

*Saunders v. Sunrun, Inc.*, Case No. 1:19-cv-3127 (N.D. Ill. May 9, 2019), ECF No. 1; Compl.,

*Ewing v. Encore Solar, LLC*, Case No. 3:18-cv-02247-CAB-MDD (S.D. Cal. Sept. 27, 2018),

ECF No. 1; Notice Removal, *Va v. Sunrun Inc.*, Case No. 1:18-cv-00856-JHR-KBM (D.N.M.

Sept. 12, 2018), ECF No. 1; Notice Removal, *Barker v. Sunrun Inc.*, Case No. 1:18-cv-00855-

KK-LF (D.N.M. Sept. 12, 2018), ECF No. 1; Compl., *Taylor v. Sunrun Inc.*, Case No. 5:18-cv-

01207-JGB-SHK (C.D. Cal. June 5, 2018), ECF No. 1; Compl., *Knapp v. Sunrun, Inc.*, Case No.

2:18-cv-00509-MCE-AC (E.D. Cal. Mar. 8. 2018), ECF No. 1; Compl., *Bozarth v. Sunrun, Inc.*,

Case No. 3:16-cv-3550-EMC (N.D. Cal. June 24, 2016), ECF No. 1; Compl., *Slovin v. Sunrun,*

*Inc.*, Case No. 4:15-cv-05340-YGR (N.D. Cal. Nov. 20, 2015), ECF No. 1.

6.   The core business of Media Mix, meanwhile, is illegal, unsolicited telemarketing to

generate solar leads, including to consumers on the NDNCR, in violation of the TCPA and other

federal law. *See generally* Compl., *United States v. Media Mix 365, LLC*, Case No. 8:19-cv-

01243-GW-JEM (C.D. Cal. June 21, 2019), ECF No. 1; Stipulation Entry Order Permanent Injunction and Civil Penalty Judgment, *id.* (C.D. Cal. June 21, 2019), ECF No. 2.

## II.    PARTIES

7.   Plaintiff Loftus is an individual.

8.   He resides in Ventura County, California.

9.   Plaintiff Sidney Naiman is an individual.

10. He resides in Maricopa County, Arizona.

11. Plaintiff Louis Naiman is an individual.

12. He resides in Clark County, Nevada.

13. Sunrun is a corporation.

14. It is a Delaware corporation.

15. Its principal place of business is 595 Market Street, 29th Floor, San Francisco, California 94105.

16. Media Mix is an LLC.

17. It is a California LLC.

18. Its principal place of business is 4 Hutton Centre Drive, Suite 200, Santa Ana, California 92707.

## III.    JURISDICTION AND VENUE

19. Jurisdiction: This Court has federal-question subject matter jurisdiction over Plaintiffs' TCPA claims pursuant to 28 U.S.C. § 1331 because the TCPA is a federal statute. 47 U.S.C. § 227; *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012). The Court has supplemental jurisdiction over Plaintiffs' CIPA claims pursuant to 28 U.S.C. § 1367 because the CIPA violations are so related to the TCPA violations—arising from the same telemarketing calls—as to form part of the same case or controversy.

20. Personal Jurisdiction: This Court has personal jurisdiction over Defendants because:

      a.     they are headquartered in California;

      b.     their conduct at issue was organized from their California headquarters; and

c.      Defendants' conduct at issue intentionally targeted Plaintiff Loftus, a California resident, while he was in California, at his cellular telephone number, which bears a California area code.

21. Venue: Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2) because a substantial part of the events giving rise to Plaintiffs' claims—namely, the direction of the illegal telemarketing and illegal recording from Sunrun's headquarters—occurred in this District.

22. Intradistrict Assignment: Assignment to this Division is proper pursuant to Civil Local Rule 3-2(c) because a substantial part of the events or omissions that give rise to Plaintiffs' claims—namely, the direction from Sunrun's headquarters of the illegal telemarketing and of the illegal recording—occurred in San Francisco.

## IV.   FACTS

**A.    California's Ban on Nonconsensual Recording of Calls with Cellular Telephones**

23. The Right of Privacy: The California State Legislature passed CIPA in 1967 to protect the right of privacy of the people of California. Secret recording "can warrant the imposition of criminal penalties, suggesting the California legislature, and perhaps an ordinary person, would view it to be highly offensive." *Safari Club Int'l v. Rudolph*, 845 F.3d 1250, 1267 (9th Cir. 2017). "In enacting the Privacy Act, the Legislature declared in broad terms its intent to protect the right of privacy of the people of this state from what it perceived as a serious threat to the free exercise of personal liberties that cannot be tolerated in a free and civilized society." *Flanagan v. Flanagan*, 41 P.3d 575, 581 (Cal. 2002) (internal quotation marks and alteration marks omitted). Accordingly, "courts are required to liberally construe section 632 to effectuate the important public policy ensuring telephonic privacy." *Kight v. CashCall, Inc.*, 179 Cal. Rptr. 3d 439, 454 (4th App. Dist. 2014).

24. Constitutional Roots: Californians have a constitutional right to privacy. The California Supreme Court has linked the constitutionally protected right to privacy with the intent and provisions of CIPA.

25. <u>Updated for Cell Phones</u>: California Penal Code section 632.7 was added to CIPA in 1992. Section 632.7 prohibits intentionally recording communications involving cellular or cordless telephones.

26. <u>No Retroactive Consent</u>: California Penal Code section 632.7 is violated the moment a recording of a cellular or cordless conversation is made without the consent of all parties thereto, regardless of whether recordation is subsequently disclosed or consented to.

**B.    The Enactment of the TCPA and Its Regulations**

27. <u>Robocalls Outlawed</u>: Enacted in 1991, the TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service." 47 U.S.C. § 227(b)(1). Calls made by an ATDS or with a prerecorded or artificial voice are referred to as "robocalls" by the Federal Communications Commission ("FCC") and herein. Encouraging people to hold robocallers accountable on behalf on their fellow Americans, the TCPA provides a private cause of action to persons who receive such calls. 47 U.S.C. § 227(b)(3).

28. <u>Rationale</u>: In enacting the TCPA, Congress found: "Evidence compiled by the Congress indicates that residential telephone subscribers consider automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy." Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 § 2(10). Congress continued: "Banning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion." *Id.* § 2(12).

29. The TCPA's sponsor described unwanted robocalls as "the scourge of modern civilization. They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone out of the wall." 137 Cong. Rec. 30,821 (1991) (statement of Sen. Hollings).

30. <u>Prior Express Written Consent</u>: The FCC has made clear that "prior express written consent" is required before making telemarketing robocalls to wireless numbers. Specifically, it ordered:

> [A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received clear and conspicuous disclosure of the consequences of providing the requested consent, *i.e.*, that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.

*In the Matter of Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnote and internal quotation marks omitted).

31. <u>Do Not Call Registry</u>: Additionally, the TCPA outlaws unsolicited telemarketing (robocalls or otherwise) to phone numbers on the NDNCR. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2). Encouraging people to hold telemarketers accountable on behalf on their fellow Americans, the TCPA provides a private cause of action to persons who receive such calls. 47 U.S.C. § 227(c)(5).

**C.    The Worsening Problem of Robocalls and Spam Texts**

32. Unfortunately, the problems Congress identified when it enacted the TCPA have only grown worse in recent years.

33. "Month after month, unwanted [communications], both telemarketing and informational, top the list of consumer complaints received by the [Federal Communications] Commission." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961, 7991 ¶ 1 (2015).

34. "Robocalls and telemarketing calls are currently the number one source of consumer complaints at the FCC." Tom Wheeler, *Cutting off Robocalls* (July 22, 2016), https://www.fcc.gov/news-events/blog/2016/07/22/cutting-robocalls (statement of FCC Chairman).

35. "The FTC receives more complaints about unwanted calls than all other complaints combined." Comment of the Staff of the Federal Trade Commission's Bureau of Consumer Protection, *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Notice of Proposed Rulemaking*, CG Docket No. 02-278, at p. 2; FCC 16-57 (June 6, 2016), *available at* https://www.ftc.gov/system/files/documents/advocacy_documents/comment-staff-ftc-bureau-consumer-protection-federal-communications-commission-rules-regulations/160616robocallscomment.pdf.

36. In 2017, the FTC received 4,501,967 complaints about robocalls, up from 3,401,614 in 2016. Federal Trade Commission, *FTC Releases FY 2017 National Do Not Call Registry Data Book and DNC Mini Site* (Dec. 18, 2017), https://www.ftc.gov/news-events/press-releases/2017/12/ftc-releases-fy-2017-national-do-not-call-registry-data-book-dnc.

37. Like most other leading newspapers, *The New York Times* has been writing and reporting on the exploding number of robocall complaints filed by consumers with the FTC and widespread consumer outrage about illegal telemarketing. Gail Collins, *Let's Destroy Robocalls*, N.Y. Times. (Mar. 1, 2019), https://www.nytimes.com/2019/03/01/opinion/robocall-scams.html; Tara Siegel Bernard, *Yes, It's Bad. Robocalls, and Their Scams, Are Surging*, N.Y. Times (May 6, 2018),  https://www.nytimes.com/2018/05/06/your-money/robocalls-rise-illegal.html.

38. An Emmy-winning journalist recently observed: "Everybody is annoyed by robocalls. Hatred of them might be the only thing that everyone in America agrees on now." *Robocalls*, Last Week Tonight with John Oliver (HBO Mar. 10, 2019), *available at* https://www.youtube.com/watch?v=FO0iG_P0P6M.

39. The harm from of illegal robocalls is "is at least $3 billion per year from lost time alone." Babette Boliek & Eric Burger, *Beating Back Unwanted Robocalls*, FCC (June 5, 2019), https://www.fcc.gov/news-events/blog/2019/06/05/beating-back-unwanted-robocalls (statement of FCC Chief Economist and FCC Chief Technology Officer).

40. In fact, the harm is much greater than the time lost outright, because "little surges of the stress hormone cortisol" from interruptions from smartphones result in elevated heart rates, sweaty hands, tightened muscles, anxiety and distraction, a "switch cost" that weighs on a person

even after the interruption ends, reducing his or her efficiency by 40%. Stephanie Stahl, *Constant Interruptions From Smartphone Can Impact Brain Chemistry, Scientists Say*, CBS Philly (May 29, 2018), https://philadelphia.cbslocal.com/2018/05/29/scientists-constant-interruptions-smartphone-impact-brain-chemistry/.

41. Robocalls are overwhelming hospitals and patients, threatening a new kind of health crisis. Tony Romm, *Robocalls Are Overwhelming Hospitals and Patients, Threatening a New Kind of Health Crisis*, Wash. Post (June 17, 2019), https://www.washingtonpost.com/technology/2019/06/17/robocalls-are-overwhelming-hospitals-patients-threatening-new-kind-health-crisis/.

**D.     Sunrun's Years-Long History of Illegal Robocalls and Telemarketing**

42. Sunrun sells goods and services related to solar energy.

43. Some of Sunrun's marketing strategies involve ATDSs.

44. Some of Sunrun's marketing strategies involve the use of ATDSs to place telemarketing phone calls.

45. Sunrun uses Twilio.

46. Sunrun uses CallFire.

47. Sunrun uses Five9.

48. Sunrun uses InContact.

49. Sunrun uses Skype.

50. Sunrun uses Ytel.

51. Sunrun uses equipment that has the capacity—(1) to store numbers to be called or (2) to produce numbers to be called, using a random or sequential number generator—and to dial such numbers automatically (even if the system must be turned on or triggered by a person).

52. Recipients of these outbound calls, including Plaintiffs, did not consent to receive them.

53. Sunrun's telemarketing calls were not necessitated by an emergency.

54. Thousands of people have complained to the FCC or FTC about telemarketing by Sunrun or its affiliates and vendors.

55. To thwart victims' efforts to determine who is illegally robocalling them, Sunrun hides behind aliases such as "Solar America."

56. Sunrun's practice is to continuing robocalling people even after they file TCPA lawsuits against it.

57. Sunrun labels people who complain about its telemarketing "screamers" even if they don't scream.

58. According to Sunrun's former employees, people who receive Sunrun's telemarketing are generally annoyed by it and don't want to buy Sunrun's products.

59. Sunrun calls numbers on the NDNCR several times a day for weeks at a time despite do-not-call requests from the people at those very numbers.

60. Sunrun accepts the benefits of its vendors' illegal telemarketing while knowing that it's illegal.

61. Sunrun tries to distance itself from its vendors, calling them "imposters."

62. Sunrun uses vendors even though they are subjects of FTC enforcement actions for illegal telemarketing.

63. Violating the TCPA is profitable for Sunrun.

**E.    Media Mix's Years-Long History of Illegal Robocalls and Telemarketing**

64. Media Mix markets goods and services related to solar energy and sells leads to companies that sell the same.

65. One of Media Mix's marketing strategies involves ATDSs.

66. One of Media Mix's marketing strategies involves the use of ATDSs to place telemarketing phone calls.

67. Media Mix uses equipment that has the capacity—(1) to store numbers to be called or (2) to produce numbers to be called, using a random or sequential number generator—and to dial such numbers automatically (even if the system must be turned on or triggered by a person).

68. Recipients of these outbound calls, including Plaintiff Loftus, did not consent to receive them.

69. Media Mix's telemarketing calls were not necessitated by an emergency.

70. Scores of people have complained to the FCC or FTC about telemarketing by Media Mix.

71. To thwart victims' efforts to determine who is illegally robocalling them, Media Mix hides behind aliases such as "Solar Research Group" and falsely claims not to be making sales calls.

72. Media Mix calls numbers on the NDNCR.

73. Media Mix has access to the NDNCR but has not downloaded any phone numbers from it since 2013.

74. Media Mix called at least thousands of phone numbers more than 3 times in a single day.

75. Media Mix called at least thousands of phone numbers more than 30 times each.

76. Media Mix called at least one number more than 300 times in less than six months.

77. Media Mix called at least one number over 1,000 times in less than one year.

78. Violating the TCPA is profitable for Media Mix.

**F.    Defendants' Unsolicited, Automated Telemarketing to Plaintiff Loftus**

79. Plaintiff Loftus is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153(39).

80. He is the user of a phone number that begins "(805) 405" (the "Loftus Phone Number"). All calls to him referenced herein were to the Loftus Phone Number.

81. The Loftus Phone Number is assigned to a cellular telephone service.

82. The Loftus Phone Number has been listed on the NDNCR since 2006.

83. Plaintiff Loftus never consented to receive calls from Sunrun.

84. He never gave the Loftus Phone Number to Sunrun.

85. He never did business with Sunrun.

86. Sunrun called the Loftus Phone Number.

87. Sunrun made telemarketing calls to the Loftus Phone Number.

88. Sunrun made telemarketing calls to the Loftus Phone Number using an ATDS.

89. On September 27, 2018, a motion for preliminary approval was filed in *Slovin*, with a class period ending on August 31, 2018.

90. Media Mix made unsolicited, automated telemarketing calls to the Loftus Phone Number on Sunrun's behalf on at least the following occasions:

      a.     September 4, 2018

      b.     September 5, 2018 (twice)

      c.     September 6, 2018 (twice)

      d.     September 7, 2018 (twice)

      e.     January 25, 2019

91. The January 25, 2019, call was answered by Plaintiff Loftus.

92. When he answered, there was a long click and pause, indicating that an ATDS had been used to dial the call.

93. But Plaintiff Loftus had not consented to receive calls from Media Mix.

94. On information and belief, and based in part on the area code of the caller IDs, the caller IDs were spoofed or selected so as to create the false impression that the call was being dialed by a live person in Plaintiff Loftus's community rather than a distant computer.

95. During the call, Media Mix transferred Plaintiff Loftus to Sunrun and Sunrun's goods and services were promoted.

96. Media Mix recorded a portion of the call without Plaintiff Loftus's consent.

97. Sunrun recorded a portion of the call without Plaintiff Loftus's consent.

98. Plaintiff Loftus was not interested in Sunrun's products.

99. After the January 25, 2019, call, Plaintiff Loftus called Sunrun several times asking that it stop calling him.

100.    Nevertheless, Sunrun called him again, offering its goods and services.

101.    The caller IDs that appeared on the calls included (805) 741-1860 and (805) 202-5175.

**G.      Sunrun's Unsolicited, Automated Telemarketing to Plaintiff Sidney Naiman**

102.    Plaintiff Sidney Naiman is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153(39).

103.    He is a user of a phone number that begins "(925) 735" (the "Sidney Naiman Phone Number"). All calls to him referenced herein were to the Sidney Naiman Phone Number.

104.    The Sidney Naiman Phone Number is assigned to a cellular telephone service.

105.    Plaintiff Sidney Naiman never consented to receive calls from Defendants.

106.    He never gave the Sidney Naiman Phone Number to Defendants.

107.    He never did business with Defendants.

108.    Sunrun called the Sidney Naiman Phone Number on March 15, 2019.

109.    That call, like others from Sunrun to the Sidney Naiman Phone Number, was characterized by a distinctive click and pause, indicating that it had been autodialed.

110.    Sunrun made telemarketing calls to the Sidney Naiman Phone Number.

111.    Sunrun made telemarketing calls to the Sidney Naiman Phone Number using an ATDS.

112.    The caller IDs that appeared on the foregoing calls to the Sidney Naiman Phone Number was (925) 247-1615.

113.    On information and belief, and based in part on the area code of the caller IDs, the caller IDs were spoofed or selected so as to create the false impression that the call was being dialed by a live person in Plaintiff Sidney Naiman's community rather than a distant computer.

114.    Plaintiff Sidney Naiman received an e-mail from "Mustafa from Sunrun," mustafa.fazli@sunrun.com.

115.    The original complaint in this case included TCPA allegations by Plaintiff Sidney Naiman and included the first 6 digits of his phone number. (Dkt. No. 1.) It was filed on March 27, 2019. (*Id.*)

116.    Process was served on Sunrun on April 3, 2019. (Dkt. No. 6.)

117.    Nevertheless, in the months since, Sunrun has continued to call Plaintiff Sidney Naiman, at the same phone number, to try to sell him its goods and services.

118.     For example, on May 22, 2019, Sunrun made an autodialed call to Plaintiff Sidney Naiman.

119.     The caller ID showed as (925) 291-9451.

120.      Plaintiff Sidney Naiman said not to send him autodialed telemarketing calls.

121.     On May 22, 2019, Sunrun sent an email to Plaintiff Sidney Naiman's email address.

122.     As another example, on May 29, 2019, Sunrun left a message on Plaintiff Sidney Naiman's voicemail.

123.     The caller ID showed as (530) 410-9794.

124.     As another example, later on May 29, 2019, Sunrun called Plaintiff Sidney Naiman's phone. The caller ID showed as (530) 410-9794.

**H.     Sunrun's Unsolicited, Automated Telemarketing to Plaintiff Louis Naiman**

125.     Plaintiff Louis Naiman is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153(39).

126.     He is the user of a phone number that begins "(707) 832" (the "Louis Naiman Phone Number"). All calls to him referenced herein were to the Louis Naiman Phone Number.

127.     The Louis Naiman Phone Number is assigned to a cellular telephone service.

128.     The Louis Naiman Phone Number has been listed on the NDNCR since 2015.

129.     Plaintiff Louis Naiman never gave the his phone number to Defendants.

130.     Plaintiff Louis Naiman never did business with Defendants.

131.     Sunrun called the Louis Naiman Phone Number on March 25, 2019.

132.     Sunrun used an ATDS to make that call.

133.     The caller ID that showed on that call was (707) 244-0518.

134.     The purpose of the call was to sell Sunrun's goods and services.

135.     On March 25, 2019, Sunrun sent an email to Plaintiff Louis Naiman's email address.

136.     Sunrun called the Louis Naiman Phone Number on May 6, 2019.

137.     Sunrun used an ATDS to make that call.

138.    The caller ID that showed on that call was (707) 247-6959.

139.    The purpose of that call was to sell Sunrun's goods and services.

**I.      The Invasion of Privacy Caused by Defendants' Automated Telemarketing**

140.    Before directing their automated telemarketing to them, Defendants never did anything to confirm that Plaintiffs had provided prior express written consent to their telemarketing.

141.    Plaintiffs' attention was caught by the fact that the calls appeared local.

142.    Sunrun had and has a pattern and practice of recording calls—even cellular calls—with Californians without having obtained their consent.

143.    Media Mix had and has a pattern and practice of recording calls—even cellular calls—with Californians without having obtained their consent.

144.    The conduct alleged herein:

    a.      invaded Plaintiffs' privacy and solitude;

    b.      was highly offensive to Plaintiffs;

    c.      interrupted Plaintiffs' train of thought;

    d.      wasted Plaintiffs' time;

    e.      annoyed Plaintiffs;

    f.      harassed Plaintiffs; and

    g.      consumed the battery life of Plaintiffs' cellular telephones.

## V.      VICARIOUS LIABILITY

145.    For more than twenty years, the FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

146.    In a January 4, 2008, ruling, the FCC likewise held that a company on whose behalf a telephone call is made bears the responsibility for any violations.

147.    The FCC has instructed that sellers such as Sunrun may not avoid liability by outsourcing telemarketing to third parties, such as Media Mix 365:

[A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment, limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "sellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy."

*In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6588 ¶ 37 (2013) (footnotes and alteration marks omitted).

148.    On May 9, 2013, the FCC released a Declaratory Ruling holding that a corporation or other entity that contracts out its telephone marketing "may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *Id.* at 6574 ¶ 1.

149.    Sunrun is liable for telemarketing calls physically dialed by Media Mix.

150.    Sunrun hired Media Mix to originate new business for Sunrun using telemarketing calls.

151.    Sunrun controls the day-to-day activities of Media Mix's telemarketing.

152.    Sunrun restricts the geographic location to which its telemarketing vendors, including Media Mix, can call.

153.    Sunrun instructs its telemarketers, including Media Mix, regarding certain numbers that they should or should not call.

154.    Sunrun knew or reasonably should have known that Media Mix was violating the TCPA on Sunrun's behalf but Sunrun failed to take effective steps within its power to cause Media Mix to stop.

155. Any reasonable seller that accepts telemarketing leads from lead generators whose leads are challenged in TCPA litigation or otherwise would and should investigate to ensure that the calls were made in compliance with the TCPA.

156. Media Mix was alleged to have made calls on behalf of Sunrun in *Slovin*.

157. Last Friday, the FTC alleged that since at least 2015, Media Mix has called millions of phone numbers on the NDNCR and has repeatedly or continuously called consumers with the intent of annoying, abusing or harassing them.

158. Sunrun is well aware of Media Mix's abusive conduct but continues its relationship with Media Mix.

159. The May 2013 FCC ruling states that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *Id.* at 6592-593 ¶ 46. Evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 ¶ 46.

## VI.   CLASS ACTION ALLEGATIONS

160. Cellular Telephone Class Definition: Pursuant to Federal Rules of Civil Procedure 23(b)(2) and (b)(3), Plaintiffs bring this case on behalf of three classes (each a "Class," collectively, the "Classes"). The first Class (the "Cellular Telephone Class") is defined as follows: All persons in the United States to whom:

        a.     Defendants, any of them and/or a third party acting on any of their behalf made a call or sent a text message;

        b.     to a cellular telephone number;

        c.     using an ATDS or an artificial or prerecorded voice;

        d.     between September 1, 2018, and the first day of trial.

161. Plaintiffs are members and proposed representatives of the Cellular Telephone Class.

162.    <u>DNC Class Definition</u>: The second Class (the "DNC Class") is defined as follows: All persons in the United States to whom:

       a.      Defendants, any of them and/or a third party acting on any of their behalf made a call or sent a text message;

       b.      to a residential (including residential cellular) telephone number listed on the NDNCR for at least 31 days before at least two of such communications in a 12-month period;

       c.      for telemarketing purposes;

       d.      between September 1, 2018, and the first day of trial.

163.    Plaintiffs Loftus is a member and proposed representative of the DNC Class.

164.    <u>California Cellular Telephone Class Definition</u>: The third Class (the "California Cellular Telephone Class") is defined as follows: All persons in California with whom:

       a.      Defendants, any of them and/or a third party acting on any of their behalf participated in a phone call;

       b.      while the person was on a cellular telephone;

       c.      between June 26, 2018, and the first day of trial.

165.    <u>Exclusions</u>: Excluded from the Classes are Defendants, any entity in which Defendants (or any of them) have a controlling interest or that has a controlling interest in Defendants (or any of them), Defendants' legal representatives, assignees, and successors, the judges to whom this case is assigned and the employees and immediate family members of all of the foregoing.

166.    <u>Numerosity</u>: The Classes are so numerous that joinder of all their members is impracticable.

167.    Sunrun is among the largest solar energy companies in the United States.

168.    Sunrun is publicly traded.

169.    Sending a robotext or placing a robocall costs less than one cent.

170.    Therefore, Defendants could afford to, and did, send millions of robocalls.

171.  <u>Commonality</u>: There are many questions of law and fact common to Plaintiffs and members of their respective Classes. Indeed, the very feature that makes Defendants' conduct so annoying—its automated nature—makes this dispute amenable to classwide resolution. These common questions of law and fact include, but are not limited to, the following:

        a.      whether the calls were dialed *en masse* by ATDSs;

        b.      whether Defendants' desire to sell solar goods and services constitutes an "emergency" within the meaning of the TCPA;

        c.      whether Defendants are in the United States;

        d.      whether Defendants had a pattern and practice of failing to obtain prior express written consent from people to whom they directed telemarketing;

        e.      whether Defendants had a pattern and practice of recording parts of cellular communications without having obtained the consent of all parties;

        f.      whether Defendants had a pattern and practice of failing to remove cellular telephone numbers from their telemarketing lists;

        g.      whether Defendants had a pattern and practice of failing to remove numbers on the NDNCR from their telemarketing lists;

        h.      whether Defendants' violations of the TCPA were knowing or willful; and

        i.      whether Defendants should be enjoined from continuing to robocall and telemarket to people in violation of the TCPA and from continuing to record cellular communications in violation of CIPA.

172.  <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the Classes. Plaintiffs' claims and those of the Classes arise out of the same course of conduct by Defendants and are based on the same legal and remedial theories.

173.  <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs have retained competent and capable counsel experienced in TCPA class action litigation. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Classes and have the financial resources to do so. The interests of Plaintiffs and their counsel are aligned with those of the proposed Classes.

174.     Superiority: The common issues arising from this conduct that affect Plaintiffs and members of the Classes predominate over any individual issues, making a class action the superior means of resolution. Adjudication of these common issues in a single action has important advantages, including judicial economy, efficiency for Class members and classwide *res judicata* for Defendants. Classwide relief is essential to compel Defendants to comply with the TCPA.

a.     Control: The interest of individual members of the Classes in individually controlling the prosecution of separate claims against Defendants is small because the damages in an individual action (up to $1,500 per TCPA violation, and $5,000 per CIPA violation) are dwarfed by the cost of prosecution.

b.     Forum: The forum is a desirable, efficient location in which to resolve the dispute because Sunrun is headquartered in it and the Court is already familiar with many of the key issues from *Slovin v. Sunrun, Inc.*, Case No. 4:15-cv-05340-YGR.

c.     Difficulties: No significant difficulty is anticipated in the management of this case as a class action. Management of the claims at issue is likely to present significantly fewer difficulties than are presented in many class actions because the calls at issue are automated (and thus highly uniform) and because the TCPA and CIPA articulate bright-line standards for liability and damages.

175.     Appropriateness: Defendants have acted on grounds generally applicable to the Classes, thereby making final injunctive relief and corresponding declaratory relief with respect to the Classes appropriate on a classwide basis.

## VII.     FIRST CLAIM FOR RELIEF
**(Violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227(b)(1)—Robocalling)**
**On Behalf of Plaintiffs and the Cellular Telephone Class**
**Against All Defendants**

176.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

177.     Defendants and/or their affiliates or agents violated the TCPA, 47 U.S.C. § 227(b)(1), by placing non-emergency calls to the cellular telephone numbers of Plaintiffs and

members of the Cellular Telephone Class using an ATDS and/or artificial or prerecorded voice without prior express written consent.

178.    Plaintiffs and members of that Class are entitled to an award of $500 in damages for each such violation. 47 U.S.C. § 227(b)(3)(B).

179.    Plaintiffs and members of that Class are also entitled to and do seek an injunction prohibiting Defendants and/or their affiliates and agents from violating the TCPA, 47 U.S.C. § 227(b)(1), by placing non-emergency calls (including text messages) to any cellular telephone number using an ATDS and/or artificial or prerecorded voice without prior express written consent.

## VIII.    SECOND CLAIM FOR RELIEF
**(Knowing and/or Willful Violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227(b)(1)—Robocalling)**
**On Behalf of Plaintiffs and the Cellular Telephone Class**
**Against All Defendants**

180.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

181.    Defendants and/or their affiliates or agents knowingly and/or willfully violated the TCPA, 47 U.S.C. § 227(b)(1), by placing non-emergency calls to the cellular telephone numbers of Plaintiffs and members of the Cellular Telephone Class using an ATDS and/or artificial or prerecorded voice without prior express written consent.

182.    Plaintiffs and members of that Class are entitled to an award of up to $1,500 in damages for each such knowing and/or willful violation. 47 U.S.C. § 227(b)(3).

## IX.    THIRD CLAIM FOR RELIEF
**(Violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227(c)—Telemarketing)**
**On Behalf of Plaintiff Loftus and the DNC Class**
**Against All Defendants**

183.    Plaintiff Loftus realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

184.    Defendants and/or their affiliates or agents violated the TCPA, 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2), by placing multiple unsolicited telemarketing calls within a

12-month period to the residential (including residential cellular) telephone numbers of Plaintiff Loftus and members of the DNC Class even though those numbers had been listed on the NDNCR for at least 31 days.

185.   Plaintiff Loftus and members of that Class seek an award of $500 in damages for each such violation. 47 U.S.C. § 227(c)(5)(B).

186.   Plaintiff Loftus and members of that Class are also entitled to and do seek an injunction prohibiting Defendants and/or their affiliates and agents from violating the TCPA, 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2), by placing unsolicited telemarketing calls (including text messages) to any telephone numbers listed on the NDNCR for at least 31 days.

## X.   FOURTH CLAIM FOR RELIEF
**(Knowing and/or Willful Violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227(c)—Telemarketing)**
**On Behalf of Plaintiff Loftus and the DNC Class**
**Against All Defendants**

187.   Plaintiff Loftus realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

188.   Defendants and/or their affiliates or agents knowingly and/or willfully violated the TCPA, 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2), by placing multiple unsolicited telemarketing calls within a 12-month period to the residential (including residential cellular) telephone numbers of Plaintiff Loftus and members of the DNC Class even though those numbers had been listed on the NDNCR for at least 31 days.

189.   Plaintiff Loftus and members of that Class are entitled to and seek an award of up to $1,500 in damages for each such violation. 47 U.S.C. § 227(c)(5).

## XI.   FIFTH CLAIM FOR RELIEF
**(Violations of the California Invasion of Privacy Act, Cal. Penal Code § 632.7—Eavesdropping)**
**On Behalf of Plaintiff Loftus and the California Cellular Telephone Class**
**Against All Defendants**

190.   Plaintiff Loftus realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

191.    Defendants and/or their affiliates or agents violated CIPA, Cal. Penal Code § 632.7, by recording cellular telephone calls with Plaintiff Loftus and members of the California Cellular Telephone Class without their consent.

192.    Plaintiff Loftus and members of that Class are entitled to and seek an award of $5,000 in damages for each such violation.

193.    Plaintiff Loftus and members of that Class also seek an injunction prohibiting Defendants and/or their affiliates and agents from violating CIPA, Cal. Penal Code § 632.7, by recording cellular telephone calls with Californians without their consent.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of all members of the Classes, pray for judgment against Defendants as follows:

A.    Certification of the proposed Classes;

B.    Appointment of Plaintiffs as representatives of their respective Classes;

C.    Appointment of the undersigned counsel as counsel for the Classes;

D.    A declaration that actions complained of herein violate the TCPA and CIPA;

E.    An order enjoining Defendants and their affiliates, agents and related entities from engaging in the conduct set forth herein;

F.    An award to Plaintiffs and the Classes of damages, as allowed by law;

G.    An award to Plaintiffs and the Classes of costs and attorneys' fees, as allowed by law, equity and/or California Code of Civil Procedure section 1021.5;

H.    Leave to amend this complaint to conform to the evidence presented at trial; and

I.    Orders granting such other and further relief as the Court deems necessary, just, and proper.

## XIII.    DEMAND FOR JURY

Plaintiffs demand a trial by jury for all issues so triable.

## XIV.    SIGNATURE ATTESTATION

The CM/ECF user filing this paper attests that concurrence in its filing has been obtained from each of its other signatories.

1

2       RESPECTFULLY SUBMITTED AND DATED this 26th day of June, 2019.

3

4                                By: */s/ Jon B. Fougner*
                                     Jon B. Fougner
5

6                                     Anthony I. Paronich, *Pro Hac Vice*
                                      anthony@paronichlaw.com
7                                     PARONICH LAW, P.C.
                                      350 Lincoln Street, Suite 2400
8                                     Hingham, Massachusetts 02043
                                      Telephone: (617) 738-7080
9                                     Facsimile: (617) 830-0327

10

11                                    Edward A. Broderick, *Pro Hac Vice*
                                      *Forthcoming*
12                                    ted@broderick-law.com
                                      BRODERICK LAW,  P.C.
13                                    99 High Street, Suite 304
                                      Boston, Massachusetts 02110
14                                    Telephone: (617) 738-7080
                                      Facsimile: (617) 830-0327
15

16                                    Matthew P. McCue, *Pro Hac Vice*
                                      mmccue@massattorneys.net
17                                    THE LAW OFFICE OF MATTHEW P. McCUE
                                      1 South Avenue, Suite 3
18                                    Natick, Massachusetts 01760
                                      Telephone: (508) 655-1415
19                                    Facsimile: (508) 319-3077

20

21                                    Andrew W. Heidarpour, *Pro Hac Vice*
                                      aheidarpour@hlfirm.com
22                                    HEIDARPOUR LAW FIRM, PPC
                                      1300 Pennsylvania Avenue NW, 190-318
23                                    Washington, DC 20004
                                      Telephone: (202) 234-2727
24

25                                    *Attorneys for Plaintiffs William Loftus, Sidney*
                                      *Naiman, Louis Naiman and the Proposed*
26                                    *Classes*

27

28